UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                                         Criminal Action No. 11-20628

vs.                                     HON. MARK A. GOLDSMITH

WILLIAM DAVIS,

    Defendant.
_____/

## OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. 12)

### I. INTRODUCTION

Defendant William Davis filed a motion to suppress (Dkt. 12), seeking to exclude the firearm that is the subject of the present indictment charging him with felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Defendant argues that the alleged stop by the police and the alleged search and seizure that followed were unreasonable and in violation of the Fourth Amendment. The Government filed a response (Dkt. 19), and an evidentiary hearing was held on August 28, 2012 and October 23, 2012. After the hearing, the Court requested, and the parties filed, supplemental briefs (Dkts. 25, 30). For the reasons set forth below, the Court denies the motion.

### II. BACKGROUND

On September 27, 2011, three Flint Police Department officers responded to a radio dispatch to investigate a disturbance at 330 Ridgeway Street in Flint. Tr. Vol. I at 10-11 (Dkt. 20). The officers had been called to investigate a 911 call, where a female caller had reported

being threatened by a black male, who was wearing dark clothing and had a firearm of some kind, either a rifle or a handgun. Id. at 12, 14-16.

One of the officers who responded to the call, Michael West, testified that he drove to 330 Ridgeway Street in his marked cruiser. Id. at 9. While en route to Ridgeway Street, Officer West stopped an individual on Summit Street, north of Ridgeway Street, who he believed matched the description provided by the dispatch. Id. at 12, 16. Officer West subsequently released the individual.

Officer West then turned onto Ridgeway Street and proceeded west, where he saw Defendant standing in the middle of the block near 330 Ridgeway Street. Id. at 18-19. As he was driving, Defendant saw Officer West's car and then turned and walked quickly away from Officer West. Id. at 20, 45.

Officer West proceeded down the block in his cruiser; behind him were two other officers in their own vehicles. Id. at 19-20. According to Officer West, Defendant then passed through the front gate of 322 Ridgeway Street. Id. Officer West pulled in front of 322 Ridgeway Street, rolled down his window, and ordered Defendant to stop. Id. at 20-21. He did so because (i) Defendant matched the description given by dispatch, (ii) Defendant, upon seeing Officer West's cruiser, walked quickly away from Officer West, and (iii) Officer West believed that Defendant was trying to get away. Id. at 47-48. Defendant did not stop, but rather continued walking to the front porch. Id. at 21. At this point, Officer West got out of his cruiser and followed Defendant. Id. As Officer West was at the gate where the sidewalk borders the front lawn, Defendant, with his back to Officer West, approached the front of the house. Id. at 21, 28. Officer West testified that he felt threatened and drew his weapon "in a downward motion" and ordered Defendant to stop and get on the ground. Id. at 21. Defendant did not comply, but turned clockwise to Officer

2

West, and as he turned, he threw a dark object into the bushes next to the front porch. Id. Officer West ordered Defendant to the ground and Defendant complied. Id. at 24, 29-30. Officer West then arrested Defendant. Id.

Sergeant Bernritter – another officer who responded to the dispatch call to 330 Ridgeway Street – also testified to the encounter with Defendant. Sergeant Bernritter was in a cruiser driving behind Officer West on Ridgeway Street. Id. at 58. He also saw Defendant on the sidewalk near 330 Ridgeway Street and that Defendant turned and walked quickly away from the police. Id. at 60. When Defendant entered the gate of 322 Ridgeway, Officer Bernritter was still in his cruiser. Id. at 61. Officer Bernritter then got out of his cruiser, but did not draw a weapon. Id. Defendant then stopped walking and made an exaggerated motion with his arm where he drew a black semi-automatic pistol as he was turning to the officers. Id. at 64, 71. At this point Sergeant Bernritter trained his tactical rifle upon Defendant and, as he did so, he observed Defendant making a sweeping motion with his arm, rather than aiming the pistol. Id. at 71. As he made the motion, he released the pistol and it hit the porch and then fell into the bushes next to the front porch. Id. at 65-66, 71-72. When the pistol hit the porch it made the sound of a "metallic object hitting concrete." Id. at 65-66. After Defendant got on the ground and was being handcuffed by Officer West, Sergeant Bernritter went over to the bushes and found the pistol, which was "freshly laying" on the ground without dirt or leaves covering it. Id. at 73.

Both officers testified that they did not know Defendant and had no prior interaction with him. Id. at 24, 54.

Defendant called two witnesses: Evon Pool (Defendant's grandmother who lived with him at 322 Ridgeway Street and had raised him since he was ten years old) and Lakeisha Davis (Defendant's cousin who had known Defendant all of her life, and had lived across the street

3

from the Pool home for 20 years). Tr. Vol. II at 5-7, 83.

Pool testified that, on September 27, 2011, she was going to grocery store with Lakeisha Davis. Id. at 78. Before she left for the store, she called Defendant, who was in the backyard, to come to the front yard. Id. Pool wanted Defendant to remain in the front yard until she returned from shopping. Id.

Pool testified she went out onto the front porch and that Defendant then walked from the backyard to the front sidewalk and then entered the gate into the front yard. Id. at 79. As Defendant was coming into the front yard, Pool testified that from the front porch she saw the police came down the street. Id. Police officers then got out of their cars, entered the front yard with guns drawn, forced Defendant to the ground and arrested him. Id. at 80. According to Pool, she heard the officers threaten to kill Defendant. Id. at 82. Pool, however, did not see which officer made the threat. She stated "I didn't even look at the officer, you know. I just, you know, saw the trucks and stuff." Id. Pool did not see anything in Defendant's hand, and she did not see him throw an object. Id. Pool did not see Defendant with a handgun on the day of his arrest and had no idea where the gun that was retrieved from her bushes came from. Id. at 98. She stated that she does not keep guns in her home. Id.

Pool also testified that Defendant suffers from paranoid schizophrenia and receives mental health care. Id. at 83. According to Pool, Defendant would not leave the house often due to his illness and, on the day of his arrest, was home the entire day. Id. 93-95.

The last witness, Lakeisha Davis, stated that, on September 27, 2011, Pool had called her to go grocery shopping and so she walked across the street. Id. at 7. She did not enter 322 Ridgeway Street immediately, but stayed outside on the driveway, talking on her cell phone and smoking a cigarette. Id. Davis stated that Defendant was in the backyard, but then Pool told him

to go to the front yard.  Id. at 10.  Defendant walked past Davis and then leaned on the fence talking to Pool, who was now on the front porch.  Id. at 11-12.

Davis testified that she saw police two blocks down the street.  Id. at 15.  She then went inside to use the restroom and was inside the home for about five minutes.  Id.  Davis then came out the front door of the house and saw Pool on the porch and Defendant was on the ground, handcuffed, and surrounded by police.  Id.  Davis was unsure how many officers were present. Id.

In addition to the testimony of the four witnesses, the evidence included approximately 148 pages of Defendant's mental health records (Dkts. 29 - 29-5).  In pertinent part, a medical record from November 11, 2011, states that Defendant had found a handgun at his grandmother's house:

> William states that he did not have a gun but found one in the grandmother's house about two months ago.  "I didn't know how to work it and they took it away from me."  "I found it in my grandma's room because I was looking around because I didn't have nothing else to do."  "I didn't want to hurt myself then or the other day but I told the cops that they would have to shoot me first anyway."  William states that he was in the back yard when the police arrived and it took four of them to take him to the ground because William would not listen to their instructions.  "I was scared and wasn't doing anything wrong and they just came into my yard and pulled some guns on me and started yelling at me.  William reports that when his family members found him with this gun a couple months ago, they took this gun from him and hid it in the backyard.  William states that he did not know where the gun was and did not find it the day the police came to the house.  William reports that someone called the police stating there was a person meeting his description walking up and down the sidewalk with a gun in hand.  "I did not have the gun and was not walking down the street. l didn't even know where the gun was."

Def.'s Ex. at 13, PgID 323 (Dkt. 29-4).

### III.  ANALYSIS

Defendant seeks to suppress the firearm that forms the basis of his indictment.  Defendant argues that the actions of the Flint Police officers amounted to an illegal seizure that violated the

5

Fourth Amendment. In response, the Government argues that Defendant was never "seized," and that, even if he was, the officers had reasonable suspicion to stop and detain him. For the reasons stated below, the Court agrees with the Government's first point and will deny Defendant's motion on that basis.

As the Supreme Court explained in <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1999), a seizure under the Fourth Amendment occurs when a police officer applies physical force to apprehend someone or gives a show of authority, such as shouting "'Stop, in the name of the law!' at a fleeing form," <u>and</u> the person submits to the show of authority. However, an attempted seizure is not a seizure. <u>Id.</u> at n.2. Likewise, a seizure does not occur when an individual does not comply with an officer's command. <u>Id.</u>

The Supreme Court applied the foregoing principles to the facts of <u>Hodari D.</u>, which involved two police officers on a routine patrol in their cruiser who encountered a group of youths, including Hodari. <u>Id.</u> at 622. When the youths saw the officers' cruiser, they took off running. <u>Id.</u> at 622-623. The officers gave pursuit; one officer remained in the car, the other ran on foot. <u>Id.</u> at 623. The officer on foot tackled Hodari just after Hodari had tossed away a small rock, which turned out to be cocaine. <u>Id.</u> The state trial court denied Hodari's motion to suppress, but was reversed by the state court of appeals. <u>Id.</u> After the California Supreme Court denied the state's application for review, the U.S. Supreme Court reversed, holding that, even assuming the officer's pursuit constituted a show of authority to enjoin Hodari to halt, Hodari was not seized until he was actually tackled. <u>Id.</u> at 629. The Court concluded that, because Hodari abandoned the cocaine while he was running, the cocaine was not the fruit of a seizure – as the seizure had not occurred yet – and reversed the state appeals court. <u>Id.</u>

6

The Sixth Circuit has relied on Hodari D. in cases where defendants have not complied with a show of authority from an officer and then discarded a firearm. For example, in United States v. Martin, 399 F.3d 750 (6th Cir. 2005), the officer encountered the defendant walking on a sidewalk near the property of a housing authority. Because the defendant had been issued a "disbarment letter" to prevent the defendant from being on the property of the housing authority, the officer commanded the defendant to stop. Id. at 752. The defendant did not comply and took flight. Id. The officer chased the defendant and, during the chase, the defendant tossed away a firearm. Id. The officer eventually cornered and arrested the defendant with the assistance of other officers. Id. The district court found that the officers lacked reasonable suspicion to conduct a Terry stop but nevertheless admitted the firearm into evidence because the defendant had not been seized at the time the firearm was discarded. Id. at 753.

On appeal, the Sixth Circuit affirmed. It cited Hodari D. and reiterated the rule that "when a suspect refuses to submit to a show of authority by the police, the suspect is not seized by the police until such time as he or she submits or is forced to submit to police authority." Id. at 752. Relying upon a footnote in Hodari D., the Sixth Circuit explained that this rules applies "even when the show of authority is an unlawful one." Id. (citing Hodari D., 499 U.S. at 624 n.1). The Sixth Circuit also rejected the argument that abandonment of property cannot occur in the face of police misconduct. Id. at 753. Instead, the court explained that "if no seizure has occurred, abandonment can occur," even if "the attempted seizure or show of authority constitutes police misconduct" or police misconduct caused the abandonment. Id.

The Sixth Circuit re-affirmed the legal principle that a defendant's rights under the Fourth Amendment are not triggered until there is a seizure, relying on United States v. Thomas, 77 F. App'x 862 (6th Cir. 2003). In Thomas, three officers approached a group of men standing

7

on the porch of housing project at 3:15 a.m. Id. Although the officers did not suspect criminal activity, the officers decided to make contact with the men. Id. at 862-863. The men began to walk toward one of the officers, who stood in their way and commanded the men to stop and get on the ground. Id. The men did not comply, and then the defendant dropped an object, later determined to be a firearm. Id. The Sixth Circuit affirmed denial of the defendant's motion to suppress the firearm, explaining the defendant "was not detained for Fourth Amendment purposes until he complied with [the officer's] order to get on the ground." Id. The court concluded that "the discovery of the pistol was not the fruit of a seizure, but the result of [the defendant's] voluntary decision to discard the pistol (in the officer's sight) as the officer approached." Id. at 864-865.

Turning to the facts of the present case, the Court concludes that the preponderance of the evidence supports a finding that the encounter between Defendant and the police officers occurred as the officers recounted it. That is, Defendant discarded the firearm prior to submitting to the police directive to go to the ground. The officers' testimony presents a logical narrative of events, from first responding to the 911 call to encountering Defendant with whom they had no prior history of interaction. Officer West and Sergeant Bernritter recounted similar sequences of Defendant's actions, including the motion with his arm as his withdrew his handgun and tossing it into the vegetation next to the front porch prior to submitting to the police directive to get to the ground.

Furthermore, the Court concludes that the testimony of the defense witnesses is not credible and does not support a finding that the police officers illegally seized Defendant. First, Pool's narration of events is not credible because it is highly unlikely that the police simply drove up to 322 Ridgeway Street, exited their vehicles with guns drawn, and seized Defendant

on his grandmother's front lawn. Second, Davis' account of events is of limited weight, as she testified that she entered the home for five minutes and did not see the arrival of the officers. Third, both defense witnesses are related to Defendant. Pool admitted to raising Defendant, and Davis grew up with him, visits 322 Ridgeway Street regularly, and helps her grandmother – all of which shows that their testimony is not free from bias. Fourth, the mental health record conflicts, in part, with the testimony provided by Pool because it demonstrates that Defendant had found a gun in his grandmother's home around the time of the incident, even though Pool had testified that she did not keep guns in her home.

Because the Court finds that Defendant possessed the handgun and discarded it <u>before</u> complying with Officer West's orders, Defendant was not seized prior to abandoning the handgun. Defendant's actions are similar to the defendants in <u>Martin</u> and <u>Thomas</u>, who did not comply with officers' orders, discarded firearms, and then were seized, in that order. <u>Martin</u>, 399 F.3d at 752; <u>Thomas</u>, 77 F. App'x at 863. Here, Officer West first ordered Defendant to stop. After Defendant did not comply and passed through the front gate, Officer West exited his vehicle and again ordered Defendant to stop when he saw that Defendant had reached for something on his person. Before compliance with Officer West's second order, Defendant abandoned his handgun. As the authorities cited above explain, the abandoned handgun was not the fruit of an illegal seizure because the seizure had not yet occurred. <u>Hodari D.</u>, 499 U.S. at 629.

Because of the Court's conclusion that Defendant abandoned the firearm before any stop was effectuated through his ultimate submission to the police command to go to the ground, the Court need not determine whether there was "reasonable suspicion" to stop Defendant under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). Abandonment of evidence prior to an illegal stop or other

9

seizure does not require suppression of the evidence. Martin, 399 F.3d at 753.

Finally, the Court rejects Defendant's argument that the Fourth Amendment has somehow been violated on the theory that the police arrested Defendant within the curtilage of Defendant's home. Def.'s Br. at 4 (Dkt. 25). Defendant's theory is not spelled out, but whatever the police did within the curtilage of the house took place after they had given orders to Defendant to stop and go to the ground and after he had abandoned the firearm. Officer West was not inside the curtilage when Defendant tossed the firearm instead of complying with an order to get to the ground. Tr. Vol. I. at 21. Officer West was outside the curtilage at the front gate. Id. at 28-29. After Defendant tossed the weapon, Officer West ordered Defendant again to the ground and Defendant complied. Id. 29-30. The abandonment occurred prior to submission, and Defendant's Fourth Amendment rights were not implicated until he complied. Hodari D. 499 U.S. at 626 ("An arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority."). Again, any police activity after abandonment, even if illegal, does not trigger a Fourth Amendment violation supporting suppression. Martin, 399 F.3d at 753.

For all of the above reasons, the Court denies Defendant's motion (Dkt. 12).

SO ORDERED.

Dated: January 16, 2013         s/Mark A. Goldsmith
    Flint, Michigan          MARK A. GOLDSMITH
                         United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 16, 2013.

                         s/Deborah J. Goltz
                         DEBORAH J. GOLTZ
                         Case Manager